**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| RICHARD ILOWITE, | ) | |
| | ) | Hon. Harold A. Ackerman |
| Plaintiff, | ) | |
| | ) | Civil Action No. 04-2368 |
| v. | ) | |
| | ) | **OPINION & ORDER** |
| DIOPSYS, INC., | ) | |
| JOSEPH FONTANETTA, | ) | |
| JOHN DOE, RICHARD ROE, and | ) | |
| MARY TOE (the latter three | ) | |
| names being imaginary and fictitious), | ) | |
| | ) | |
| Defendants. | ) | |

_____)

Frank R. Butterfield, Esq.
FELDMAN & FIORELLO, LLC
Wayne Plaza I
145 Route 46 West
Wayne, New Jersey 07470-6830
*Attorneys for Plaintiff*

Steven J. Luckner, Esq.
Lynn LaPierre, Esq.
COUGHLIN DUFFY LLP
350 Mount Kemble Avenue
P.O. Box 1917
Morristown, New Jersey 07962-1917
*Attorneys for Defendant*


**ACKERMAN, Senior District Judge:**

This matter comes before the Court on Defendants' motion for summary judgment (Doc.

No. 36) as to all four counts of Plaintiff's Second Amended Complaint, and Plaintiff's cross-

motion (Doc. No. 42) for partial summary judgment as to Plaintiff's breach of contract claim and

Defendants' two counterclaims.  For the following reasons, Defendants' motion will be denied, except insofar as it seeks to preclude Plaintiff's pursuit of stock option damages.  Plaintiff's motion for partial summary judgment will be denied as to Plaintiff's breach of contract claim, and granted as to Defendants' counterclaims.

## *Background*

Plaintiff Richard Ilowite ("Ilowite") is a computer software developer and consultant in the field of medical diagnostics and computer graphics.  Defendant Diopsys, Inc. ("Diopsys") is a small start-up company that develops computer-driven opthalmological devices for children.[1]  In 2002, Defendant Joseph Fontanetta, the President of Diopsys, sought to hire someone to assist with software development and federal compliance for Diopsys's products, and was introduced to Ilowite, who runs a company out of his home called Hudson Valley Computer Systems ("Hudson Valley").  Shortly thereafter, Hudson Valley and Diopsys entered into a consulting agreement drafted by Ilowite (hereinafter the "Consulting Agreement").

The Consulting Agreement outlines Hudson Valley's contracting services, with a term of September 25, 2002 to December 24, 2002, and recites that Hudson Valley will be compensated $6,000 per month, to be paid at the beginning of each month in which Hudson Valley rendered its services.  In addition, the Consulting Agreement states that Hudson Valley will "[p]rovide technical services as required for the design, implementation, documentation, and testing of the product software functions and enhancements" necessary for Diopsys's operating software, known as the Enfant System-II, and federal compliance according to the regulations of the Food

---

[1] Diopsys is a corporation based in the State of New Jersey with its principal place of business in New Jersey.   Ilowite is a resident of the State of New York and operates Hudson Valley Computer Systems from his home.

& Drug Administration ("FDA").  (Luckner Cert., Ex. B ("Consulting Agreement") at § 1.1a.)  Thus, the Consulting Agreement assigns two general tasks to Hudson Valley: (1) designing and updating the Enfant System-II and (2) ensuring compliance with FDA regulations.  The Consulting Agreement states that its provisions are to be governed by the laws of the State of New York.

At some point around the time the parties entered into the Consulting Agreement, Ilowite and Diopsys signed an undated letter of intent (the "Letter" or "Letter of Intent") drafted by Fontanetta for Diopsys.  Defendants contend that the Letter of Intent was signed after the parties entered into the Consulting Agreement, while Ilowite suggests that the Letter of Intent was signed prior to the time the parties entered into the Consulting Agreement.

The Letter provides that "[t]his document constitutes an offer of employment between Diopsys, Incorporated [ ] and Richard A. Ilowite [ ] for the position of Vice President/Software Engineering."  (Luckner Cert., Ex. C ("Letter of Intent").)  In addition, the Letter states that Ilowite's employment "shall be effective as of January 2, 2003 or any other date mutually agreed upon by both interested parties.  The conditions and term of employment will be determined by a fully executed employment contract between Diopsys and Ilowite."  (*Id.*)  The Letter stipulates that Ilowite will be compensated at an annual salary of $120,000 per year and will be given 75,000 shares of Diopsys stock options.  Further, the Letter states that Ilowite will be eligible to exercise rights under profit sharing, group insurance, major medical, and other plans which Diopsys may provide to its employees.  The Letter does not contain a choice of law provision.

Ilowite contends that he entered into these two agreements with the understanding that Diopsys would hire him full-time according to the terms designated in the Letter of Intent.

3

Defendants assert that they "could not hire Ilowite as an employee until Diopsys received an infusion of capital." (Defs.' Statement of Material Facts ("Defs.' SMF") at ¶ 8.) Thus, Defendants believe that Ilowite's full-time hiring was subject to a contingency, namely, the availability of outside funding. While Ilowite acknowledges that "Defendants represented to Plaintiff that the only reason they were not immediately hiring Plaintiff as Vice President was that Diopsys was undergoing temporary cash flow problems," (Pl.'s Statement of Material Facts ("Pl.'s SMF") at ¶ 13), Ilowite contends that he was informed that this cash infusion was imminent and "committed." (*Id.*) Defendants contend that Diopsys received a cash loan of $500,000 in mid-2003 to cover daily expenses, but did not secure outside investment until approximately March 2004. The parties never mutually agreed upon an alternative start date for Ilowite's full-time employment.

At the end of December 2002, Fontanetta handed Ilowite a $6,000 check. Ilowite says that he believed that this check "constituted a holiday bonus." (*Id.* at ¶ 15.) Defendants assert that this check served as payment for Ilowite's January consulting fee, pursuant to the Consulting Agreement with Hudson Valley, even though the Consulting Agreement's term expired on December 24, 2002. In the following months, Defendants continued to pay Ilowite this monthly fee, adding $1,500 to $2,000 on occasion to help alleviate Ilowite's financial pressures. Defendants also assisted in paying Ilowite's healthcare expenses. Ilowite contends that during the early months of 2003, Fontanetta repeatedly assured him that he would soon be hired full-time and that Ilowite would receive compensation backdated to January 2, 2003, and stock option vesting backdated to September 25, 2002. Defendants demur that they never orally promised Ilowite backdated compensation and stock options. Defendants represented to the public that

4

Ilowite was one of its Vice Presidents, often by means of mail and internet communications.

In July 2003, Ilowite wrote to Fontanetta seeking the compensation he would have allegedly received had he been hired full-time in January 2003.  Ilowite also alleges that Robert Levinson, a Diopsys Board member, assured Ilowite in the late summer that he "would be made whole."  (Pl.'s Second Am. Compl. ¶ 28(g).)  Ilowite contends that around October 2003, Defendants "acknowledged that it was their position that by accepting the monthly payments of $6,000 Plaintiff had voluntarily accepted the extension of the consulting relationship[.]"  (Pl.'s SMF at ¶ 20.)  Defendants assert that in October 2003, Fontanetta told Ilowite "that the company was still waiting for additional funding."  (Defs.' SMF at ¶ 22.)  Later that month, Ilowite told Diopsys that he considered himself constructively terminated and thereafter ceased performing his work for Diopsys.  Ilowite contends that he considered himself terminated by virtue of Defendants' failure to perform pursuant to the Letter of Intent.

In late 2003, Defendants allegedly discovered that Ilowite's updates on the Enfant System-II were not performing properly.  Peter Derr, a Diopsys employee, allegedly hired local students to supplement his efforts to remedy the software problems.  In addition, in the late summer of 2004, the FDA inspected the Diopsys facilities, and found that Diopsys's products violated FDA regulations.  (*See* Butterfield Cert., Ex. G.)  Around that same time, Defendants allegedly hired John Gardner as a paid consultant to help achieve federal compliance.

Ilowite filed this suit in May 2004.  In his Second Amended Complaint, Ilowite seeks damages pursuant to (I) breach of contract under the Letter of Intent and subsequent oral agreements; (II) fraud; (III) unjust enrichment; and (IV) promissory estoppel.  Defendants filed counterclaims against Ilowite for (I) breach of contract under the Consulting Agreement and (II)

5

unjust enrichment.  Defendants moved for summary judgment as to all four counts of Ilowite's

Second Amended Complaint.  Ilowite moved for a grant of partial summary judgment in his

favor on his breach of contract claim, as well as summary judgment as to Defendants' two

counterclaims.  The Court addresses both motions together herein.

### *Analysis*

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will

be granted:

> if the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with
> the affidavits, if any, show that there is no genuine
> issue of material fact and that the moving party is
> entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir. 1989); *Chipollini v.*

*Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987).  In other words, "summary judgment may

be granted if the movant shows that there exists no genuine issue of material fact that would

permit a reasonable jury to find for the nonmoving party."  *Miller v. Indian Hosp.*, 843 F.2d 139,

143 (3d Cir. 1988).  All facts and inferences are construed in the light most favorable to the non-

moving party.  *See Peters v. Delaware River Port Auth. of Pa. and N.J.*, 16 F.3d 1346, 1349 (3d

Cir. 1994).

The substantive law will identify which facts are "material."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247-48 (1986).  Therefore, "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment."  *Id.* at 248.  An issue is "genuine" if a reasonable jury could possibly hold in the

nonmovant's favor with regard to that issue. *Id.* At the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the finder of fact. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Therefore, to raise a genuine issue of material fact, the summary judgment opponent "'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id.* (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); see also *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991) (stating that non-movant may not "rest upon mere allegations, general denials, or . . . vague statements"). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-50. Sitting in diversity, this Court applies the law of New Jersey to determine the sufficiency of each party's claims.

I.    **There Are Genuine Issues of Material Fact Regarding Ilowite's Breach of Contract Claim.**

In Defendants' motion for summary judgment, they argue that the Letter of Intent and alleged subsequent oral agreements are invalid contracts. Further, they argue, even if the Letter is a valid contract, their offer of employment was subject to an unsatisfied contingency, and for

7

this reason, they did not breach the contract.  Finally, Defendants argue that Ilowite's alleged

continued acceptance of payment under the Consulting Agreement serves as a waiver of

performance under the Letter of Intent.  Ilowite contends that the Letter of Intent was an

enforceable contract and that there was no contingency to be satisfied.  Because the substantive

law identifies which facts are "material," *Anderson*, 477 U.S. at 247-48, and because the Letter of

Intent does not contain a choice of law provision, the Court applies New Jersey law.  *Miller,* 843

F.2d at 143.

### A.    The Letter of Intent Constitutes a Valid Contract.

It is hornbook law that "the test for enforceability of an agreement is whether both parties

have manifested an intention to be bound by its terms and whether the terms are sufficiently

definite to be specifically enforced."  *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298-99

(3d Cir. 1986).  Additionally, there must be consideration on both sides.  *Id.*  "Conduct may take

the place of written or spoken words in the formation of contracts."  *Johnson & Johnson v.*

*Charmley Drug* Co.*,* 11 N.J. 526, 539 (1953).  "Where the parties do not agree to one or more

essential terms, however, courts generally hold that the agreement is unenforceable."  *Weichert*

*Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992); *see also Malaker Corp. Stockholders Protective*

*Comm. v. First Jersey Nat'l Bank*, 163 N.J. Super. 463, 474 (App. Div. 1978) ("An agreement so

deficient in the specification of its essential terms that the performance by each party cannot be

ascertained with reasonable certainty is not a contract, and clearly is not an enforceable one.").

"When courts determine the extent to which vagueness in an agreement will be tolerated, each

case, being unique, turns on its facts."  *Acme Plastics of N.J., Inc. v. Int'l Fixtures, Ltd.*, No.

02-5906, 2007 WL 1321197, at *3 (D.N.J. May 4, 2007) (internal quotation omitted).  It is well

accepted that "an ambiguous contract is to be construed against the drafter." *Englert v. The Home Depot*, 389 N.J. Super. 44, 58 (App. Div. 2006) (internal quotation omitted).

In this matter, there is ample evidence to show that the parties intended the Letter to constitute a contract. The Letter contains the material terms establishing Ilowite's rights and obligations. The Letter's first line states: "This document constitutes an offer of employment between Diopsys, Incorporated [ ] and Richard A. Ilowite [ ] for the position of Vice President / Software Engineering." (Letter of Intent.) The agreement then enumerates Ilowite's duties to "direct and provide the computer engineering necessary," and sets Ilowite's compensation at an annual salary of $120,000 plus various benefits. (*Id.*) The agreement is undated, but the parties' mutual assent is demonstrated by the appearance of both parties' signatures at the bottom of the document. While the start date for employment is somewhat ambiguous, stating that Ilowite's "employment shall be effective as of January 2, 2003 or any other date mutually agreed upon by both interested parties," (*id.*), the parties never agreed to an alternative date. Thus, January 2, 2003 could serve as the operative start date. Accordingly, the "agreement is not so deficient in the specification of its *essential terms* that the performance by each party cannot be ascertained with reasonable certainty." *Malaker Corp.*, 163 N.J. Super. at 474 (emphasis added).

In addition to the terms of the Letter, undisputed evidence supports a finding that, as a matter of law, the parties intended the Letter to constitute a contract. For instance, Defendants included Ilowite in their business plan, stating that Ilowite was slated to receive 75,000 stock options. (*See* Pl.'s Opp. Br., Butterfield Cert., Ex. B.) Diopsys's website also described Ilowite as "VP Engineering," (*id.*, Ex. C.), and Ilowite utilized business cards to the same effect, of which Fontanetta was aware. (*See* Fontanetta Tr. at 35:16-18.) Thus, in addition to the terms of

the Letter, the Defendants' "conduct" supports the parties' intention to form a contract for

Ilowite's full-time employment.  *Johnson & Johnson,* 11 N.J. at 539.

Further, Ilowite presents sufficient evidence to support a finding of consideration.  In

exchange for Defendants' promise to hire Ilowite full-time, Ilowite promised to work in the

agreed capacity beginning January 2, 2003 or at an alternative date.  *See Channel Home Ctrs.*,

795 F.2d at 299 ("Consideration confers a benefit upon the promisor or causes a detriment to the

promisee and must be an act, forbearance or return promise bargained for and given in exchange

for the original promise.") (internal quotation omitted); *In re Lueders' Estate*, 164 F.2d 128, 135

(3d Cir. 1947) ("Consideration for a promise is . . . a return promise, bargained for and given in

exchange for the promise.").  Thus, Ilowite presents sufficient evidence to support the

enforceability of a contract.

<u>**B.**</u>      **<u>There is a Dispute of Material Fact Regarding the Validity of</u>**
         **<u>Ilowite's Alleged Oral Agreements With Defendants.</u>**

Ilowite also bases his breach of contract claim on alleged oral agreements made with

Fontanetta in the early months of 2003.  Ilowite contends that Fontanetta promised Ilowite back-

pay and stock option vesting to September 2002 if Ilowite continued to work at a reduced rate in

2003.  Ilowite presents evidence supporting a finding of consideration because he continued to

work at a reduced rate in 2003 in exchange for Fontanetta's alleged promises.  Ilowite supports

his assertion of these additional oral agreements by producing a memorandum he sent to

Fontanetta, dated July 22, 2003, detailing this compensation arrangement.  (*See* Lucker Cert., Ex.

F.)  Defendants dispute Ilowite's contention of additional oral agreements.

Whether Ilowite may prove the enforceability of these oral agreements is a question of

fact for a jury.  *See Naples v. McCann,* 24 N.J. Super. 568, 574 (App. Div. 1953) (holding that the parties' divergent accounts as to the existence of an oral agreement constitute "a factual issue which should have been resolved by the jury as a trier of facts.").  There is a dispute of material fact as to the existence of the oral agreements, and accordingly, whether Defendants breached these oral agreements.  Thus, Defendants' motion for summary judgment as to Ilowite's breach of contract claim pursuant to the alleged oral agreements will be denied.

<u>C.</u>    <u>There is a Genuine Dispute Whether the Letter of Intent Required Satisfaction of a Condition Precedent.</u>

Defendants argue that "[e]ven if the Court were to find that the Letter was an enforceable contract, a condition precedent to the performance of the contract was not met and the contract therefore fails."  (Defs.' Br. at 8.)  Specifically, Defendants argue that Ilowite's "start-date was contingent on the Company's receipt of funding."  (*Id.* at 9.)  Ilowite responds that his hiring was not contingent upon outside funding and that "rather [Ilowite] was advised that he could not start until January 2, 2003 based on funds that were 'committed' and 'imminent.'"  (Pl.'s Opp. Br. at 9.)

A contingency to a contract is synonymous with a condition precedent, *see Marsa v. Metrobank for Sav., F.S.B.*, 825 F. Supp. 658, 664 (D.N.J. 1993), and an unfulfilled condition precedent to a contract renders a contract agreement invalid, *Sutherland v. Chesson,* No. 02-00981, 2006 WL 1000574, at *8 (N.J. App. Div. April 18, 2006); *see also First Atl. Leasing Corp. v. Tracey*, 738 F. Supp. 863, 867 (D.N.J. 1990) ("[W]here a promise is subject to a condition, no liability can arise upon that promise if the condition is not met.").  Thus, if the Letter was subject to a condition precedent and this condition was not satisfied, then by law,

Defendants cannot be found liable for breach of an unenforceable contract, and summary judgment must be granted in favor of Defendants.

As the moving parties, Defendants carry the initial burden of establishing the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. In support of their motion for summary judgment, Defendants point to an alleged ambiguity in the Letter of Intent: "The term of Ilowite's employment shall be effective as of January 2, 2003 *or any other date mutually agreed upon by both interested parties.*" (Letter of Intent (emphasis added).) Crucially, however, no condition precedent is expressly mentioned in the Letter. To interpret the alleged ambiguity of the above clause, Defendants offer several documents obtained through discovery. First, in Ilowite's Answers to Defendants' First Set of Interrogatories, Ilowite states:

> Fontanetta [ ] told Plaintiff that the Company was having temporary cash flow problems and proposed that if Plaintiff would agree to work on a consulting basis for 3 months at a reduced rate of $6,000 per month, Plaintiff would then come on board as a full time employee on January 2, 2003. Fontanetta told Plaintiff that Diopsys was expecting an imminent infusion of capital that had already been committed and *it was just a matter of some minor legal and financial paperwork before Diopsys had the funding in hand.*

(Luckner Cert., Ex. G at 18 (emphasis added).) Ilowite acknowledges that his full-time employment with Diopsys could not commence at the time of their agreement in September because Diopsys did not yet have the necessary capital to fund Ilowite's position. Indeed, this circumstance was the very reason for entering into the Consulting Agreement; it does not support Defendants' argument that the *Letter* contained an implied condition precedent. Ilowite discusses Defendants' financial circumstance further in his deposition:

> [Fontanetta] had actually described this as something that was an inch away from being an absolute certainty. I believe he described it as

12

simply a matter of some minor paperwork, dotting some i's, crossing some t's.  But that the financing had been committed and agreed to and was, for all intents and purposes certain to happen.

. . .

But during all these conversations - the content of [Fontanetta's] description over our financial situation was that it would - we were perpetually in an *almost any day now type of scenario when it came to obtaining the funding* and being in a position whereby that difference would be made up to me and that *my employment would technically begin*.

(Luckner Cert., Ex. D ("Ilowite Tr.") at 37:2-25, 56:17-56:24 (emphases added).)  Again,

Ilowite's testimony does not tend to support Defendants' argument that the parties contemplated

an implied condition precedent in the Letter of Intent.  Rather, it shows that, in subsequent

conversations *after the parties' agreement to the Letter*, Fontanetta conveyed to Ilowite that

Diopsys's financial difficulties would soon be remedied.

Defendants also point to depositions from Defendant Fontanetta and Peter Derr, a

Diopsys employee.  First, Fontanetta was directly asked about the circumstances surrounding

Ilowite's hiring:

> Q.   Now, in [the Letter of Intent] it sets forth Ilowite's employment shall be effective as of January 2, 2003.  Was that your original intent to hire Ilowite as a full-time employee of Diopsys on January 2, 2003?
> A.   No.
> Q.   Was it ever your intent to hire him as an employee on January 2, 2003?
> A.   When I wrote this, the agreement was that when we raised our financing, which was going to be around that date that we would consider entering into an employment agreement. That's why I wrote "mutually agreed upon."
>
> . . .
>
> Q.   And you're saying that your inclusion of that phrase "mutually agreed upon by both interested parties" was

> because you were waiting for financing for his full-time
> employment?
>
> A.    Correct.

(Butterfield Cert., Ex. C ("Fontanetta Tr.") at 11:21-12:8, 12:15-19.)  Second, Defendants offer

the deposition of Derr:

> A.    Ilowite wasn't planning on coming on, was hoping that he
> could come on full board based on funding.  That's really all
> I knew of the arrangement; that basically at some point in
> time that they would hire him as a full-time employee.
>
> Q.    Is that something that Ilowite told you or you found out from
> someone else?
>
> A.    I believe I found that out from Ilowite.

(*Id.*, Ex. B ("Derr Tr.") at 33:21-34:6.)  Fontanetta's self-serving interpretation of "mutually

agreed upon" fails to establish, as a matter of law, the existence of a condition precedent.

*Marioni v. 94 Broadway, Inc.*, 374 N.J. Super. 588, 609 (App. Div. 2005) (finding defendant's

"self-serving statement insufficient to support the dismissal of plaintiff's claim on summary

judgment grounds).

Defendants fail to demonstrate the existence of an unsatisfied condition precedent so as to

establish the absence of a genuine dispute regarding Ilowite's breach of contract claim.

Construing the terms of the Letter against the drafter, Fontanetta, and examining the evidence

generally in a light most favorable to Ilowite, the Court notes two factors: First, the Letter makes

no mention of a condition precedent.  *See GNOC, Corp. v. Dir., Div. of Taxation*, 328 N.J. Super.

467, 476-77 (App. Div. 2000) (interpreting contract based on its plain terms and construction).

Second, the Court finds that Ilowite's statements regarding Diopsys's funding circumstance

explained why Ilowite was not hired full-time immediately in September 2002, but do not

concede that the Letter of Intent was subject to a condition precedent.  Accordingly, there is a

14

genuine dispute as to whether the parties exhibited a meeting of the minds regarding a condition

precedent.  This dispute precludes, as a matter of law, a finding that the Letter of Intent is an

unenforceable contract.  *See Don Corson Const. Co., Inc. v. Hrebek*, No. 1725-01, 2007 WL

1598655, at \*8 (N.J. App. Div. 2007) (assigning to the fact-finder the task of determining

whether the contracting parties demonstrated a meeting of the minds).

> **D.   Ilowite's Alleged Continued Acceptance Of Payment Pursuant To
> The Consulting Agreement Does Not Serve To Waive
> His Breach of Contract Claim.**

Defendants also argue that Ilowite, by allegedly continuing to accept a fee in 2003 in

accordance with the Consulting Agreement, waived his right to pursue his action for breach of

contract.[2]  "Waiver, under New Jersey law, involves the intentional relinquishment of a known

right, and thus it must be shown that the party charged with the waiver knew of his or her legal

rights and deliberately intended to relinquish them."  *Shebar v. Sanyo Bus. Corp.*, 111 N.J. 276,

291 (1988).  "[U]nless a party intentionally relinquishes a right with full knowledge of the facts,

the right persists."  *Gladstone v. Ludsin*, No. C-171-03E, 2006 WL 1642705, at \*7 (N.J. App.

Div. June 15, 2006).  However, "the intention to waive need not be stated expressly but may be

spelled out from a state of facts exhibiting full knowledge of the circumstances producing a right

and continuing indifference to exercise of that right."  *Merchants Indem. Corp. v. Eggleston*, 68

N.J. Super. 235, 254 (App. Div. 1961), *aff'd*, 37 N.J. 114 (1962).  "Where a party fails to declare

a breach of contract, and continues to perform under the contract after learning of the breach, it

may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring

---

[2] Unlike the Consulting Agreement, the Letter of Intent does not contain a choice of law provision.  In determining whether Ilowite waived performance under the *Letter of Intent*, the Court, sitting in diversity, applies the law of New Jersey.

its enforcement." *N.J. Dep't. of Envtl. Prot. v. Gloucester Envtl. Mgmt.*, 264 F. Supp. 2d 165, 177 (D.N.J. 2003). "We follow the Supreme Court's admonition that waiver issues, which turn on intent, should not be decided on a summary judgment basis." *Garden State Bldgs., L.P. v. First Fidelity Bank, N.A.*, 305 N.J. Super. 510, 527 (App. Div. 1997).

Here, Ilowite's alleged continued performance under the Consulting Agreement after he was not hired full-time on January 2, 2003 does not, standing alone, act as a waiver of his breach of contract action because there is a dispute of fact whether Ilowite intended to relinquish his right to pursue his breach of contract claim by continuing to perform under the Consulting Agreement. The mere fact that Ilowite continued to accept payment allegedly by the terms of the Consulting Agreement after January 2, 2003 does not demonstrate Ilowite's "full knowledge of the circumstances" of Defendants' alleged breach of contract, *see Merchants Indem. Corp.*, 68 N.J. Super. at 254, because Ilowite stated that Fontanetta assured Ilowite in 2003 that Ilowite would receive back-pay to January 2003 and stock option vesting backdated to September 2002. (Luckner Cert., Ex. G at 20, No. 10.)  Ilowite contends that he acted under the belief that Defendants' assurances of back-pay and full-time hiring would be realized even as of July 22, 2003, when he wrote a memorandum to Fontanetta that implied this agreement.  (Lucker Cert., Ex. F.)  The circumstances surrounding Ilowite's state of mind present a genuine dispute for the finder of fact.

Defendants' motion for summary judgment as to Ilowite's breach of contract claim will be denied.  Ilowite's motion for summary judgment in his favor on his breach of contract claim will also be denied because there are genuine issues of material fact regarding the validity of the oral agreements, the existence of a condition precedent, and whether Ilowite waived performance

16

under the Letter of Intent by his alleged continued performance under the Consulting Agreement. Defendants' arguments for limitations on Ilowite's damages will be addressed in Section V.

## II.     There Is a Genuine Issue of Material Fact Regarding Ilowite's Fraud Claim Because Ilowite Presents a Dispute as to All Five Elements of Fraud.

Defendants argue for summary judgment as to Ilowite's fraud claim because "Plaintiff has failed to establish that Fontanetta made any misrepresentation of a presently existing or past fact or that he suffered any damages as a result of his alleged reliance on a statement by Fontanetta." (Defs.' Br. at 15.) To sustain a claim for fraud, Ilowite must show that Defendant perpetrated "[1] a material representation of a presently existing or past fact, [2] made with knowledge of its falsity and [3] with the intention that the other party rely thereon, [4] resulting in reliance by that party [5] to his detriment." *Jewish Ctr. of Sussex Cty. v. Whale,* 86 N.J. 619, 624 (1981). "Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J. 1998).

Ilowite's claim for fraud is based on Fontanetta's representations that Ilowite would be paid a salary of $120,000 per year, stock options, and other benefits once Diopsys obtained the requisite funding, which Ilowite contends was targeted for January 2, 2003. Ilowite also contends that Fontanetta repeated this agreement throughout early 2003 and added that Ilowite would receive back-pay to January 2003 and stock option vesting to September 2002.

There is a genuine dispute regarding whether Fontanetta misrepresented a past or presently-existing fact because Ilowite testified that Fontanetta told Ilowite that "the financing

17

had been committed and agreed to." (Ilowite Tr. at 37:23-24.)  Defendants disagree, stating that

Fontanetta's claims all pertained to Diopsys's mere future aspiration for outside funding. (*See*

Defs.' Br. at 16.).[3]  Viewing this evidence in a light most favorable to Ilowite, the Court finds

that there is a genuine issue of material fact regarding whether Fontanetta presently

misrepresented to Ilowite that this funding was "committed" at the time the terms of the Letter of

Intent were agreed upon, and that Ilowite would receive back-pay in lieu of starting full-time

work in January 2003. (Ilowite Tr. at 37:23-24.)

Defendants argue that Ilowite fails to show that Fontanetta's representations were made

with knowing falsity, and with the intent that Ilowite rely on these representations in the hope of

securing his continued independent contracting work.  Defendants direct the Court to several

documents obtained in discovery that indicate the absence of a fraudulent intent.  In a Diopsys

brochure dated November 19, 2002, Ilowite's name is listed on the back describing the

company's capitalization.  Ilowite's name corresponds with "75,000" stock options, alongside

over twenty other individuals or companies with a capital interest in Diopsys. (*See* Pl.'s Opp.

Br., Butterfield Cert., Ex. B.)  When asked about this document during his deposition, Fontanetta

stated that the company listed Ilowite's shares "[b]ecause our attorneys told us[ ] that if there's a

possibility that you have something in writing that somebody could be getting something down

the road, you need to document it to future investors." (Fontanetta Tr. at 47:8-12.)  This

---

[3] Defendants also write that "conversations between the parties . . . as a matter of law cannot form the basis of a claim for fraud." (Defs.' Br. at 17.)  The Court is baffled by this bald assertion.  Conversations between parties that convey a misrepresentation to one side is often precisely the evidence that supports a fraud claim.  *See, e.g.*, *Emcore Corp. v. PricewaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 247 (D.N.J. 2000) (describing telephone conversations between the parties that formed, in part, the basis for a fraud claim).

evidence cuts both ways.  It may support Defendants' position that they intended to permanently hire Ilowite because they took steps to prepare for his full-time hiring.  However, this evidence also may show that the Defendants hoped to convince Ilowite to work at a reduced rate after the expiration of the Consulting Agreement by *appearing* to prepare for, and be close to, Ilowite's full-time hiring.

Defendants next direct the Court to a page from the Diopsys website listing the members of "The Diopsys Team."  (*See* Pl.'s Opp. Br., Butterfield Cert., Ex. C.)  Beneath "Joe Fontanetta" and "Peter Derr" is listed "Rick Ilowite, VP Engineering."  (*Id.*)  When asked about this webpage during his deposition, Fontanetta responded that he was aware that Ilowite was using the term "VP" and that he did not explicitly have a problem with that.  (*See* Fontanetta Tr. at 35:16-18.) Fontanetta elaborated: "We really didn't use titles.  So, you know, for our public face, because remember, we were a company looking to raise money, people related better to the titles[.]"  (*Id.* at 35:21-24.)  Similarly, this evidence offers mixed support.  It may buttress Defendants' contention that they intended to hire Ilowite full-time because they took steps to prepare for it; but this evidence may also show that Defendants intended to extract financial gain from employing and advertising Ilowite as their Vice President without ever intending to fulfill their pledge to compensate Ilowite in that role.

Ilowite points to Fontanetta's deposition to show that Fontanetta acted with knowing falsity in his promise to hire Ilowite.  Fontanetta states that he believed $120,000 per year salary was unreasonable:

> Q.    Did it seem like [Ilowite's salary was] a
>       reasonable salary for the services he was
>       going to provide?

19

A.      *No.*

. . .

Q.      [The Letter of Intent] references that he would be hired at a salary of $120,000?

A.      If he was hired.

Q.      If he was hired.   So it's your understanding that he would be never been paid [sic] that amount if he was never hired as a full-time employee.

A.      Correct.

Q.      You didn't think it was reasonable at that time?

A.      I didn't think it was reasonable.  *But if he proved he was worth $120,000 during the consulting period*, *we were willing to consider it* that was his demand.  Most of the demands in the letter of intent came from Ilowite.

(Fontanetta Tr. at 47:18-21, 48:11-25 (emphases added).)

Defendants counter with the full text of Fontanetta's transcript, about which Defendants argue that "a full reading of Fontanetta's deposition transcript reveals that while Fontanetta believed $120,000 was an unreasonable salary to pay Ilowite, he had come to grips with the fact that once Diopsys received funding, he was going to have to adjust all salaries accordingly." (Defs.' Reply Br. at 8.)  Fontanetta was asked additional questions about his intention and ability to hire Ilowite full-time at the stated salary:

Q.      Okay.  If Ilowite had to be hired at $120,000 per year, would he have been the highest paid employee of the company?

A.      No, sir.

Q.      How many other employees would have been paid more than that?

A.      If he was hired at that?

Q.      Yes.

A.      I couldn't tell you that at [that] point in time.  I

would have to adjust the salaries of existing
employees to reflect their tenure and status with
the company as well.

(LaPierre Cert., Ex. A at 49:1-12.)

Viewing the evidence presented in a light most favorable to Ilowite, the Court finds that

there is a genuine issue of material fact as to whether Fontanetta knew that his promise to hire

Ilowite full-time at a salary of $120,000 a year was false when offered to Ilowite.  Fontanetta

believed that the agreed compensation was unreasonable *and* that Ilowite's hiring was subject to

a condition: whether Ilowite "proved he was worth $120,000 during the consulting period."

(Fontanetta Tr. at 48:11-25.)  This condition ostensibly was not conveyed to Ilowite, and

Fontanetta's view is inconsistent with Ilowite's alleged understanding of their agreement.  Thus,

there is a genuine issue of material fact as to whether Fontanetta agreed to hire Ilowite full-time

at the stated salary knowing that his representations were false.  *See Shebar*, 111 N.J. at 291

(1988) ("[Q]uestions of intent . . . are factual determinations that should not be made on a motion

for summary judgment."); *Lilliston Chrysler Plymouth Dodge Truck Jeep Eagle, Inc. v.*

*Universal Underwriters Group*, 329 N.J. Super. 318, 324 (App. Div. 2000) ("A summary

judgment motion should not ordinarily be granted when an action or defense requires

determination of a state of mind or intent, such as claims of waiver, bad faith, *fraud* or duress.")

(emphasis added).

Based on the same evidence, there is also a genuine issue of material fact as to whether

Defendants intended that Ilowite rely on their representations because Fontanetta *agreed* to

compensate Ilowite $120,000, even though Fontanetta readily admits he only intended to

"consider it" if Ilowite proved himself.  (Fontanetta Tr. at 48:11-25.)  In addition, Fontanetta

suggests that he merely viewed their mutual agreement as Ilowite's one-sided "demand," (*id*.),
despite signing a statement that "[t]his document constitutes an offer of employment between
Diopsys [ ] and Richard A. Ilowite[.]"  (Letter of Intent.)

 The fourth element of fraud requires that Ilowite show that he *reasonably* relied on
Defendants' representations.  *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997).
Ilowite testified that Fontanetta gave him the impression that his hiring was "imminent" and
"committed."  (Luckner Cert., Ex. G at 18.)  In addition, Ilowite testified that he accepted the
lower-paying independent contractor position with Diopsys because he believed Defendants
would hire him in short time.  (*See* Ilowite Tr. at 27:25-28:8.)  Thus, viewing the evidence in a
light most favorable to Ilowite, there is a genuine issue of material fact as to whether Ilowite
reasonably relied on Defendants' representations.

 The final element of fraud requires Ilowite to show damages.  Defendants argue that
Ilowite fails to show any damages because Ilowite testified that he was unemployed prior to
agreeing to work for Diopsys and that Ilowite did not seek other work while working for
Diopsys.  (Ilowite Tr. at 12:10-11, 66:1-3.)  Defendants misapprehend Ilowite's claim.  If Ilowite
proves the first four elements of fraud, discussed above, Ilowite's claim for damages does not
necessarily include compensation that he would have earned from another employer during his
tenure at Diopsys.  Rather, Ilowite seeks damages for the difference in the salary allegedly
promised to him *by Defendants* after January 2, 2003 and the fee he was in fact paid during that
period by Defendants.  In addition, Ilowite seeks damages for his unrealized stock options, back-
pay in salary and stocks to January 2003 and September 2002, respectively, and other benefits
provided by Diopsys to its employees.

Ilowite presents testimony and documentary evidence in support of his damages claim. Ilowite testified that Fontanetta told him that "if I would agree to work for a smaller amount of money for a period of three months, that I would then be hired in an official capacity on January 1 or January 2." (Ilowite Tr. at 25:5-8.) Ilowite further stated that Fontanetta told him "[t]hat I would be paid the difference, that it would be made up to me as soon as possible to do so." (*Id.* at 55:24-56:1.) Ilowite supports his claim for the difference in his payment between January 2003 and July 2003 by producing a "Confidential Memorandum" dated July 22, 2003 from Ilowite to Fontanetta. (*See* Luckner Cert., Ex. F.) In this memorandum, Ilowite computes his back-pay salary allegedly owed to him by Diopsys in accordance with the promised higher rate of pay. (*Id.*) In addition, Ilowite testified and responded to Defendants' Interrogatories that he was promised stock options to be vested to a back-date in September 2002, as well as other employee benefits. (*See* Ilowite Tr. at 26:3-26:11, 27:2-27:9; Luckner Cert., Ex. G at 18, No. 10.) Fontanetta disputes these promises. (*See* Fontanetta Tr. at 60:3-4.)

In connection with the instant motion, supporting papers have been submitted by both sides which demonstrate conflicting factual accounts of whether Ilowite's claim for damages presents a genuine dispute. These conflicting accounts represent genuine material issues of fact which preclude summary judgment being rendered against Ilowite. Ilowite demonstrates that he may be entitled to damages. Accordingly, Defendants' motion for summary judgment as to Ilowite's claim for fraud will be denied.

III.    **There Is A Genuine Dispute of Material Fact Regarding Ilowite's Unjust Enrichment Claim Because Ilowite May Recover Under Implied Contract If He Can Not Recover Under Express Contract.**

23

Defendants object to Ilowite's claim for unjust enrichment because "Plaintiff cannot demonstrate that Diopsys received a benefit that was unjust." (Defs.' Reply Br. at 10.) In addition, Defendants argue in a footnote that Ilowite cannot maintain a breach of contract claim attendant to his unjust enrichment claim. (*See* Defs.' Br. at 20 n.5.) The Third Circuit has explained that pursuant to New Jersey law, "recovery under unjust enrichment may not be had when a valid, unrescinded contract governs the rights of the parties." *Van Orman v. Am. Ins. Co.*, 680 F.2d 301, 310 (3d Cir. 1982); *see also Asco Power Tech., L.P. v. Pepco Tech., L.L.C.*, No. 03-1942, 2006 WL 3000334, at *7 (D.N.J. Oct. 20, 2006) ("Since [both parties] agree that a valid contract exists in this case, the claim for quantum meruit fails as a matter of law and summary judgment as to this claim is granted."); *Moser v. Milner Hotels, Inc.*, 6 N.J. 278, 280-281 (1951) ("An implied contract cannot exist when there is an existing express contract about the identical subject.").

Here, Ilowite seeks relief for Defendants' alleged breach of express contract pursuant to the Letter of Intent. The Court has already found that there are genuine disputes regarding the validity of the oral contracts, whether the Letter of Intent was subject to a condition precedent, and whether Ilowite waived his contractual rights under the Letter of Intent by allegedly continuing to work under the Consulting Agreement. Thus, at this stage, the Court cannot determine whether Ilowite may recover under an express contract. The Court cannot grant summary judgment on unjust enrichment simply because Ilowite concomitantly pursues relief for a breach of a *potentially enforceable* contract. Accordingly, the Court turns to the merits of Ilowite's unjust enrichment claim.

In order to support a claim for unjust enrichment, a plaintiff must show that "(1) at

plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004).  "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1993).

Ilowite's claim for unjust enrichment withstands summary judgment.  Ilowite has presented sufficient evidence that Defendants agreed to compensate Ilowite at a higher rate than he was in fact compensated starting in January 2003, including additional benefits.  Ilowite supports his claim with, for instance, his July 22, 2003 memorandum to Fontanetta describing a backpay agreement.  (*See* Luckner Cert., Ex. F.)  Under Ilowite's theory, Defendants in turn received the benefit of Ilowite's work at a lower rate, a benefit that was unjust because the parties had agreed to a higher compensation.  Because there are genuine disputes regarding whether Ilowite is entitled to higher pay and benefits, Defendants' motion for summary judgment as to Ilowite's unjust enrichment claim will be denied.

## IV.     There Is A Genuine Issue of Material Fact Regarding Ilowite's Promissory Estoppel Claim.

Ilowite's final claim is based on promissory estoppel.  To support this claim, Ilowite must show "(1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that the promisee will rely thereon; (3) the promisee must in fact reasonably rely on the promise; and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise." *Aircraft Inventory Corp. v. Falcon Jet Corp.,* 18 F. Supp. 2d 409, 416 ( D.N.J.

1998).  A clear and definite promise is "the [s]ine qua non for applicability of this theory of

recovery."  *Malaker Corp. Stockholders Prot. Comm.*, 163 N.J. Super. at 479.  "[I]n order to

satisfy the prima facie case sufficient to invoke the doctrine, Plaintiff bears the burden to

demonstrate the existence of, or for purposes of summary judgment, a dispute as to a material

fact, with regard to [the] four separate elements [of promissory estoppel]."  *Watson v. City of*

*Salem*, 934 F. Supp. 643, 661 (D.N.J. 1995).

"The essential justification for the promissory estoppel doctrine is to avoid the substantial

hardship or injustice which would result if such a promise were not enforced."  *Pop's Cones, Inc.*

*v. Resorts Intern. Hotel, Inc.,* 307 N.J. Super. 461, 469 (App. Div. 1998).  Where the promise

was "clearly conditional and contingent, as opposed to clear and definite . . . there is no dispute

with regard to the first prong of the *Malaker* test and it is clear that Plaintiff cannot demonstrate

that a clear and definite promise was made to him."  *Watson*, 934 F. Supp. at 661.  For example,

in *Malaker*, the court found that an implied undertaking by one party to lend an unspecified

amount of money to another party at an unspecified date was not a "clear and definite promise."

163 N.J. Super. at 480.  However, in *Pops Cones, Inc.*, the court found that where an agreement

was "95% there," and only basically required the signature of one party, the promise was clear

and definite enough to permit the promissory estoppel claim to withstand summary judgment.

307 N.J. Super. at 472.

Here, Ilowite demonstrates a genuine dispute regarding his promissory estoppel claim.

The Court has already found that the Letter of Intent constitutes a contract.  The Letter

demonstrates definite terms, including rights, obligations, and compensation.  The fact that

Defendants' promise dictated a start date of "January 2, 2003 or any other date mutually agreed

26

upon" is not enough to find the Defendants' promise indefinite because the parties never agreed

to an alterative start date.  Thus, examining the Letter in a light most favorable to Ilowite,

January 2, 2003 could serve as the operative commencement.  (Letter of Intent.)

Further, Ilowite has demonstrated a genuine dispute whether Defendants' promises were

made with the expectation that Ilowite rely because, for instance, the Defendants began making

preparations for formalizing Ilowite's full-time hiring by naming Ilowite "V.P. Software

Engineering" on its website.  (*See* Pl.'s Opp. Br., Butterfield Cert., Ex. C.)  There is a genuine

dispute whether Ilowite in fact relied on these promises by staying on to work past the expiration

of the Consulting Agreement because he believed he was going to be hired full-time on January

2, 2003 and was promised backpay to that date.

Finally, there is a genuine dispute whether Ilowite suffered a definite and substantial

detriment in reliance on Defendants' promises because Ilowite was promised higher

compensation and benefits that he did not receive.  Thus, Ilowite demonstrates genuine issues of

material fact regarding his promissory estoppel claim.  Defendants' motion for summary

judgment as to Ilowite's promissory estoppel claim will be denied.

**V.      Limitations On Ilowite's Damages**

**A.      The Consulting Agreement's Merger And Integration Clause Does
Not Apply To Bar Ilowite's Recovery Under The Letter Of Intent.**

Defendants also seek to limit, on three grounds, the type of damages that Ilowite may

pursue for his four claims.  First, Defendants argue that Ilowite is barred from receiving the

difference between his promised compensation of $120,000 a year and his actual, lower

compensation as an independent contractor because the Consulting Agreement contains a merger

and integration clause that excludes the admissibility of prior agreements that serve as the basis
for Ilowite's four claims.  The relevant portion of this clause states: "This Agreement expresses
the entire understanding between Diopsys and [Hudson Valley] . . . [and Hudson Valley is] not
eligible to participate in or exercise rights under Diopsys' profit sharing, group insurance, major
medical and other compensation or benefit plans which Diopsys provides for its employees."
(Consulting Agreement at ¶ 10.)

 Neither party addresses a preliminary question: Whether the Consulting Agreement's
merger and integration clause applies to bar the admissibility of prior agreements between
Diopsys and *Ilowite* where Ilowite himself is not a party to the Consulting Agreement.  It does
not.  As recited earlier, the Consulting Agreement constitutes a contract between *Hudson Valley*
and Diopsys, and not a formal contract between Ilowite and Diopsys.  *See, e.g.*, *Glenn v.
Hayman*, No. 07-112, 2007 WL 894213, at *10 n.15 (D.N.J. March 21, 2007) ("Plaintiffs,
non-parties to Defendants' contracts, have no standing to sue for this alleged non-performance.").
Thus, the Consulting Agreement's merger and integration clause does not prohibit the
admissibility of prior communications between Ilowite and Diopsys that give rise to Ilowite's
own cause of action under the Letter of Intent.

 Alternatively, even if the Consulting Agreement was enforceable against Ilowite, its
merger and integration clause does not apply to bar the admissibility of Ilowite's agreements with
Defendants.  The parol evidence rule precludes, as a matter of substantive law, the introduction
of evidence of antecedent negotiations or agreements to alter a subsequent writing, on the theory
that such antecedent matters were integrated in the written agreement.  *Atl. N. Airlines v.
Schwimmer*, 12 N.J. 293, 302 (1953).  "[T]he parol evidence rule d[oes] not bar proof of changes

subsequent to the execution of the integrated writing." *Lewis v. Travelers Ins. Co.*, 51 N.J. 244, 253 (1968). Here, Ilowite seeks damages based in part on promises made by Fontanetta that Ilowite would receive back-pay to January 2003 and stock option vesting to September 2002. These alleged promises were made *subsequent* to the execution of the Consulting Agreement. (*See* Ilowite Tr. at 55:24-56:1, 57:20-22, 67:3-7.) Thus, the Consulting Agreement's merger and integration clause does not prevent Ilowite from pursuing damages based on representations regarding back-pay made *after* the Consulting Agreement was signed.

Further, in pursuing damages, Ilowite relies on the representations made by Fontanetta in the Letter of Intent. Defendants offer that the Letter of Intent was signed "[a]t some point during the consulting period." (Defs.' SMF at ¶ 6.) Interestingly, Ilowite suggests that the Letter of Intent was signed *before* the Consulting Agreement.[4] However, Fontanetta testified that "we entered into a formal consulting agreement first[.]" (Fontanetta Tr. at 9:14-15.) Viewing this evidence in a light most favorable to Ilowite, the Court finds that, even if the Consulting Agreement was enforceable against Ilowite, its merger and integration clause does not prevent the admissibility of evidence that Fontanetta made new promises regarding full-time hiring and back-pay *subsequent* to signing the Consulting Agreement.

### B.   Ilowite Does Not Present Evidence Supporting His Claim For Stock Option Damages.

The second ground upon which Defendants argue to limit Ilowite's damages is that

---

[4] "Plaintiff's employment was to begin approximately 90 days following the September 25, 2002 offer and acceptance of employment, *i.e.*, on January 2, 2003 . . . . During the interval between September 25, 2002 and the agreed date for the commencement of Plaintiff's employment on January 2, 2003, the parties also agreed that Plaintiff would work as an outside consultant[.]" (Pl.'s SMF at ¶ 7, 10.)

Ilowite is not entitled to damages for his allegedly promised stock options.  "[T]he options which Plaintiff would have received have no value and Plaintiff has not retained expert opinion to state otherwise."  (Defs.' Br. at 13.)  Ilowite is seeking "the cash equivalent and reasonable expectations of appreciated value associated with the stock options for 75,000 shares of Diopsys stock."  (Second Am. Compl. ¶ 22.)  However, the Diopsys company plan provides that stock options have no value until they vest, and then may not be sold or transferred freely because Diopsys is a close corporation.  (*See* Luckner Cert., Ex. I at ¶¶ 5, 7.)  According to Fontanetta, Diopsys stock options also must be purchased by the option holder at $0.50 a share before they can vest.  (*See* Fontanetta Tr. at 60:9-61:4.)  Ilowite acknowledges that he would have had to exercise the options at a cost to him of $0.50 a share before the options' value could even be measured.  (Ilowite's Opp. Br. at 9.)  However, Ilowite offers no evidence or argument as to how to measure the stock options' value once exercised.  Thus, Ilowite's claim for damages in the form of the value of stock options is unsupported.

"Valuing a closely-held corporation is a difficult task."  *Torres v. Schripps*, 342 N.J. Super. 419, 435 (App. Div. 2001).  "There are [ ] few assets whose valuation imposes as difficult, intricate and sophisticated a task as interests in close corporations."  *Lavene v. Lavene*, 148 N.J. Super. 267, 275 (App. Div. 1977), *cert. denied*, 75 N.J. 28 (1977).  "Although there is no general formula that will apply to the many different valuation situations, the ultimate goal is to arrive at a fair market value for a stock for which there is no market."  *Steneken v. Steneken*, 183 N.J. 290, 297 (2005) (internal quotation omitted); *cf. Bowen v. Bowen*, 96 N.J. 36, 49 (1984) ("[A] court should not base an opinion on theories of value that lack support in the record,

demonstrated market reliability, or general acceptance.").[5]

Ilowite responds to Defendants' evidence against stock option damages only in a footnote, stating that Defendants failed to "produce documents relating to funding requests[.]" (Pl.'s Br. at 10 n.1.)  Ilowite continues: "Any valuation of the business would necessarily demonstrate the value of the stock held by Plaintiff."  (*Id.*)  Ilowite is mistaken.  Discovery closed on September 1, 2006, and Defendants' motion for summary judgment was not filed until April 9, 2007.  The opportunity for Ilowite to obtain any evidence at all regarding valuation has long since passed.  Ilowite presents no evidence as to the value of his alleged stock option damages, and thus, Ilowite fails to meet his burden of establishing such damages.  Accordingly, Defendants' motion for summary judgment as to Ilowite's pursuit of stock option damages will be granted.[6]

### C.    Ilowite Is Not Precluded From Pursuing Punitive Damages.

Third, Defendants seek to prohibit Ilowite from pursuing punitive damages as to his fraud claim.  "Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a

---

[5] While the cases cited here are distinguishable as either actions for a valuation of a close corporation or a division of marital assets, the principles cited regarding the determination of a close corporation's value are germane to the issue at hand: whether Ilowite presents evidence supporting stock option damages from a close corporation.

[6] The Court's earlier finding that Defendants' promise of stock options was definite enough to form one of the bases to find a valid contract is an inquiry distinct from the Court's finding above that Ilowite fails to carry his burden to demonstrate the value of the stock options. Simply put, the existence of a contract, with definite and material terms, is a prerequisite to finding sufficient evidence justifying *damages* under that contract.

wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions."  N.J. Stat. Ann. § 2A:15-5.12(a).  Awarding punitive damages for a fraud claim falls within the province of the jury if it finds Ilowite's evidence of malicious intent credible. *McConkey v. AON Corp.*, 354 N.J. Super. 25, 55 (App. Div. 2002); *see also Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 49 (1984) ("Our cases indicate that the requirement may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences[ for punitive damages to attach]."

Here, Ilowite has already demonstrated that his fraud claim presents a genuine issue of material fact as to whether Fontanetta ever intended to hire Ilowite full-time at the agreed salary. Based on the same evidence, there is a genuine issue of whether Fontanetta made his promise to Ilowite with the requisite intent to justify punitive damages.  Accordingly, Ilowite may pursue punitive damages.  Defendants' motion for summary judgment will be granted as to Ilowite's pursuit of stock option damages and otherwise denied as to Ilowite's four claims.

**VI.     Defendants Cannot Pursue Counterclaims Against Ilowite Based On The Consulting Agreement Because Ilowite Is Not A Party To The Consulting Agreement.**

Ilowite moves for summary judgment as to Defendants' breach of contract and unjust enrichment counterclaims.  While Ilowite's claims derive from the Letter of Intent, Defendants' counterclaims arise from the Consulting Agreement.  However, unlike the Letter of Intent, which was entered into directly between Ilowite and Defendants, the Consulting Agreement expressly states in its opening line: "This document (hereinafter 'Agreement') between Hudson Valley

32

Computer Systems (hereinafter "Contractor") and Diopsys, Incorporated, including its parent and subsidiary or affiliate corporation, if any (hereinafter 'Diopsys'), whereby Contractor will render consulting and other services to Diopsys." (Consulting Agreement at 1.) Subsequent payments were made out by check to "Hudson Valley Computer Systems." (LaPierre Cert., Ex. B.) Defendants' counterclaims against Ilowite cannot stand because Defendants' counterclaims arise from the Consulting Agreement entered into with *Hudson Valley*. *See, e.g.*, *Glenn*, No. 07-112, 2007 WL 894213, at *10 n.15. To allege breach of contract and unjust enrichment under the Consulting Agreement, Defendants must pursue claims against Hudson Valley, the party to the Consulting Agreement. The Court offers no opinion on whether such a claim can be brought at this late date. Accordingly, Ilowite's motion for summary judgment as to Defendant's counterclaims will be granted without prejudice.

### *Conclusion & Order*

For the aforementioned reasons, Defendants' motion for summary judgment (Doc. No. 36) is DENIED except insofar as Defendants seek to preclude Ilowite's pursuit of stock option damages. Ilowite is precluded from presenting evidence regarding stock option damages. Ilowite's cross-motion for partial summary judgment (Doc. No. 42) is DENIED as to Ilowite's breach of contract claim, and GRANTED WITHOUT PREJUDICE as to Defendants' counterclaims.

Dated: January 31, 2007
Newark, New Jersey

/s/ Harold A. Ackerman
U.S.D.J.

33